# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

**NO. 03-24-00476-CR**
**NO. 03-24-00477-CR**

---

**Jerry John Leshikar, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE 368TH DISTRICT COURT OF WILLIAMSON COUNTY**
**NO. 16-2397-K368, THE HONORABLE RICK J. KENNON, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

The State charged appellant Jerry John Leshikar with one count of stalking and two counts of retaliation against a public servant. *See* Tex. Penal Code §§ 36.06(a), 42.072(a). Leshikar pleaded guilty to the two counts of retaliation pursuant to a plea bargain. In exchange for his pleas, the State moved to dismiss the stalking charge and recommended that he be sentenced to five years' confinement for each count of retaliation, that his sentences be suspended, and that he be placed on community supervision for a period of six years. The district court sentenced Leshikar in accordance with the State's recommendations. The State later moved to revoke his community supervision, alleging that he had violated the terms and conditions of his release. The district court found both of the State's allegations to be true, revoked his community supervision, and imposed the suspended five-year sentence in each case. In two issues on appeal, Leshikar

contends that the evidence was insufficient to support the court's findings of true. We affirm the district court's judgments revoking community supervision nunc pro tunc.

## BACKGROUND

Leshikar's community-supervision conditions[1] included the following:

1. Defendant shall commit no offense against the laws of this or any State or of the United States or any other Country. Defendant shall notify the Community Supervision Officer in charge of the case within forty-eight (48) hours of being arrested and/or charged with a criminal offense.

26. Defendant shall have **no non-emergency, threatening, harassing, harmful** contact with any Law Enforcement Officer or Agency.

In the State's third amended motions to revoke Leshikar's community supervision, it alleged violations of conditions 1 and 26:

**Defendant violated condition (1) as follows:**

On or about the weekend of February 12, 2022, the defendant engaged in behavior that was threatening and/or harassing in nature toward Brandt Rydell by publishing repeated electronic communications on a social media platform, namely Facebook, and the electronic communications were reasonably likely to cause torment to the complainant, and the electronic communications were not made in connection with a matter of public concern, to wit: posting on Mr. Rydell's social media page alleging that the defendant had some sort of sexual relationship with Mr. Rydell's young daughters and referred to Mr. Rydell's wife while inferring a sexual act. The defendant posted a photograph of Mr. Rydell and his family in that social media post. In another post from this same time period, the defendant posted a caricature of Mr. Rydell with what appears to be "crosshairs" on his forehead. The defendant has continued to torment, annoy, and embarrass the victim by the repeated social media posts made on Mr. Rydell's social media page. This is a continuation of numerous similar harassing acts committed by the defendant in November, 2021, in which the defendant posted pictures and made comments that appear to be an effort to alarm, annoy, torment, and embarrass Mr. Rydell.

---

[1] Although there were separate orders imposing conditions for each retaliation count, the conditions were the same in both.

. . . .

**Defendant violated condition (26) as follows:**

On or about the 19th day of November, 2021, the defendant threatened Community Supervision Officer Sabrina Bentley, an officer of the Court.

The State's witnesses at the revocation hearing included David Allison Joyce, Leshikar's current probation[2] officer (PO); Rydell, a former mayor of Taylor, Texas; and Officer Keely Wolf, who had encountered Leshikar while working for the Taylor and Georgetown, Texas, police departments. Its exhibits included several photographs of comments Leshikar had made on the Facebook page that Rydell created in his "role as a public servant" and on the Taylor municipal Facebook page. Leshikar did not call any witnesses during his case-in-chief.

Joyce, who had worked on "the mental health caseload" since 1999, testified about Leshikar's diagnoses and his behavior while under the supervision of both Bentley and Joyce. Leshikar had been diagnosed before 2018 with "paranoid personality disorder or delusion disorder." Joyce explained that people with Leshikar's diagnosis

> have a different focus on interactions. They are very quick to look for something that might be an attack. They are quick to take offense or to become angry at things that other people might simply roll their eyes at. They are quick to perceive an attack where there isn't an attack.

Leshikar was "quick to take offense" and "volatile," by which Joyce meant he was loud, shouted, and cursed.

In November 2021, Leshikar and his then-PO Bentley, whom Joyce testified was a law-enforcement officer, had "a bit of a spirited interchange . . . wherein [she] w[as] trying to

---

[2] Under Texas law, the terms "community supervision" and "probation" are used interchangeably. *See Shortt v. State*, 539 S.W.3d 321, 322 n.1 (Tex. Crim. App. 2018).

3

discuss with him about a drug test, and he handled it poorly." Although Joyce was not present for the confrontation, he testified that Bentley "definitely feels" that Leshikar's behavior was "harassing."

Around February 2022, Leshikar was moved to Joyce's mental-health caseload. Asked if he discussed the November 2021 incident with Leshikar, Joyce answered, "Yes and no. Truthfully, my opinion is, don't poke the bear. And if he is willing to comply with his conditions and do what is needed to do, then . . . I considered the matter as having been settled."

However, Leshikar's behavior toward Bentley—who worked in the same office as Joyce—continued to be problematic. For three years Leshikar would periodically and "somewhat consistent[ly]" stare at her through windows, throw tantrums, and go outside and shout. Once, he left the building and shouted loudly enough to be heard inside it. Joyce testified that he believed Leshikar's behavior amounted to "threatening, harassing, or harmful contact with" Bentley and that it "agitated her dramatically." He also testified that the outbursts stopped only when "we moved her out of the office, . . . so she was no longer triggering him by being there."

Regarding Leshikar's behavior toward Rydell, Joyce testified that he had prepared the resulting violation report and that Leshikar had been charged with misdemeanor harassment for his conduct.

Rydell testified about the series of Facebook comments Leshikar made beginning in 2021. Rydell had served on the Taylor City Council from 2012–2024 and as mayor of Taylor from 2017–May 2024. He created his public-service Facebook page when he was elected to the city council with the intent to avoid "confus[ing] things with anything on [his] personal page related to city business." At the time of the revocation hearing, the page was titled, "Brandt Rydell,

4

Erstwhile Mayor of the City of Taylor, Texas"; he had added the term "Erstwhile" after leaving office.

Leshikar first contacted Rydell in October 2021 to ask for the "most recent COVID count." Rydell did not respond, and Leshikar began posting to his public-servant page posts "related to COVID and critiques of [Rydell] as mayor and [his] handling of the situation." The posts were memorable for their "repetitiveness" and for the fact that Leshikar escalated "rather quickly" to personally attacking Rydell and his family in "increasingly bizarre and very specific references."

Rydell described a handful of posts from 2021—when his children ranged in age from around ten to nineteen—in detail. Beneath a photograph of Rydell and his wife, son, and three daughters, Leshikar commented, "I bet I could bang ur wife better than you, Brandt Rydell. Your daughter knows." The comment alarmed and offended Rydell and upset his family. Leshikar also posted doctored photographs of Rydell, adding "grotesque alterations" such as devil horns, "666," or "what appeared to be crosshairs" to his forehead. In one such photograph, Rydell noted that in addition to the crosshairs, Leshikar had given him fangs and wings in an attempt at "demonization." Leshikar wrote above the photo, "#BrandtRydell, #BE MINE, #Goodmorning, and #TaylorTexas."



On cross-examination, Rydell agreed that the crosshairs "could be interpreted as a cross, as well" and that although he had seen crosshairs or a "bulls-eye target" that had "circles around it," there was no circle around the crosshairs in the image of him. He also agreed that "666" and devil horns suggested a "religious component" to the imagery.

In a third post, Leshikar commented beneath another photograph of Rydell and his family, "Brandt Rydell – Mayor of the City of Taylor, Texas has four wives and a boy-slave." While photographs of the posts involving the "crosshairs" image and the comments below Rydell's family portraits were admitted at the revocation hearing, Rydell also testified about other posts for which photographs were not offered into evidence. In one, Leshikar commented, "Do you know what I do late at night," and described the contents and interior of Rydell's vehicle. In others, Leshikar altered photographs of Rydell's family by changing the sizes of his children and making "some modifications around [his] groin area." Rydell assumed that Leshikar knew about his vehicle's contents because he had taken the vehicle to an auto shop at which Leshikar's father worked and at which Rydell recalled speaking with a young man whom he assumed was Leshikar.

Nevertheless, the post about his vehicle alarmed and concerned Rydell and his wife. He assumed that Leshikar knew where he lived because Taylor is a "small town."

In addition to the posts on Rydell's public-service page, Leshikar commented about him on Taylor's municipal Facebook page. In a photograph admitted at the hearing, Leshikar wrote—beneath another user's comments mentioning Rydell—"'Someone' likes to watch his wife have sex with other men."

The Taylor police chief advised Rydell to take the posts as "a serious matter and a credible threat" and shared "some history that the Taylor Police Department had had with Mr. Leshikar" that caused Rydell "to be even more concerned about what might transpire." As a result of Leshikar's posts, Rydell "had close patrols issued" on his house, ensured that his children never left home alone, and installed "different security measures" around the house, which he kept in place for several months to a year.

Officer Wolf, who at the time of the hearing worked as a mental health officer on a Crisis Intervention Team for the Georgetown Police Department, testified that she arrested Leshikar for driving while intoxicated (DWI) in 2016. During the arrest, Leshikar asked Wolf if she had family, mentioned following them, and said that he wished he were locked in the back seat of the patrol car with Wolf. The next day, Leshikar followed Wolf's parents "home . . . back to the city of Thrall." Leshikar's behavior made Wolf's parents worry for her; they called her, and the information they provided ultimately formed the basis of a second arrest of Leshikar, for retaliation against a public servant. Wolf wrote the arrest-warrant affidavit for the offense, to which Leshikar pleaded guilty (and for which he was placed on community supervision). In addition to following Wolf's parents, Leshikar also began to show up at traffic stops at which Wolf

7

was present and at the police department to "record" Wolf's personal vehicle in the parking lot. Wolf testified that Leshikar had always "tried to rule by fear."

## STANDARD OF REVIEW

We review issues in probation-revocation cases, including sufficiency issues, for whether the trial court abused its discretion. *See Hacker v. State*, 389 S.W.3d 860, 865 (Tex. Crim. App. 2013). In the probation-revocation context, a trial court abuses its discretion if it revokes probation when the State has failed to meet its burden of proof. *Cardona v. State*, 665 S.W.2d 492, 493–94 (Tex. Crim. App. 1984); *accord Wade v. State*, 693 S.W.3d 861, 864 (Tex. App.—Austin 2024, no pet.). To revoke a defendant's community supervision, whether "regular" or deferred-adjudication, the State "need prove the violation of a condition of probation only by a preponderance of the evidence," which in "the probation-revocation context . . . means 'that greater weight of the credible evidence which would create a reasonable belief that the defendant has violated a condition of his probation.'" *Hacker*, 389 S.W.3d at 864–65 (quoting *Rickels v. State*, 202 S.W.3d 759, 764 (Tex. Crim. App. 2006)). The standard is "much lower" than "beyond a reasonable doubt" but "much higher" than "probable cause" and "reasonable suspicion." *Id.* at 865.

"Proof by a preponderance of evidence as to any one of the alleged violations of the conditions of community supervision is sufficient to support a trial court's decision to revoke community supervision and adjudicate guilt." *Cunningham v. State*, 673 S.W.3d 280, 286 (Tex. App.—Texarkana 2023, no pet.); *see Smith v. State*, 286 S.W.3d 333, 342 (Tex. Crim. App. 2009) (stating that Court of Criminal Appeals has "long held" that one sufficient ground for revocation supports order revoking community supervision). When conducting our review, we consider all

8

evidence in the record, whether admissible or inadmissible. *See Powell v. State*, 194 S.W.3d 503, 507 (Tex. Crim. App. 2006); *Cunningham*, 673 S.W.3d at 286. The trial court at a probation-revocation hearing "is the sole judge of the credibility of the witnesses and the weight to be given to their testimony," *Hacker*, 389 S.W.3d at 865, and we view the evidence in the light most favorable to the court's ruling, *see Cunningham*, 673 S.W.3d at 286; *Bell v. State*, 554 S.W.3d 742, 746 (Tex. App.—Houston [1st Dist.] 2018, pet. ref'd).

**DISCUSSION**

Leshikar contends that there was insufficient evidence to support the district court's findings that he violated conditions 1 and 26 of his community supervision. He argues that although the third amended motions to revoke alleged that the violative Facebook communications occurred on or about the weekend of February 12, 2022, there was "no evidence produced to show any 2022 behavior at all," and the evidence presented during the revocation hearing "referred to posts made by Appellant in 2021." He also argues that "the State never proved that [he] committed a criminal offense" because the motions to revoke "did not allege that [he] committed a crime, or was charged with a crime, or was convicted of a crime"; did not explicitly state that he "committed the offense of harassment or terroristic threat or any other potentially applicable offense"; and did not "cite any criminal statute, making it impossible to prove the essential elements of an offense or to even know for certain what elements needed to be proven."

I.    **There was no material variance between the motions to revoke and the evidence.**

Leshikar's first argument identifies a variance between the date alleged in the motions to revoke and the evidence presented at trial; in Texas, variance claims are treated as matters of evidentiary sufficiency and not as independent matters of notice. *See Gollihar v. State*,

46 S.W.3d 243, 247 (Tex. Crim. App. 2001) ("Some courts treat variance claims as a notice-related claim, distinct from an insufficiency of the evidence claim, but we have routinely treated variance claims as insufficiency of the evidence problems."). The variance doctrine applies in the probation-revocation context. *Hammack v. State*, 466 S.W.3d 302, 307 (Tex. App.—Texarkana 2015, no pet.); *Moore v. State*, 11 S.W.3d 495, 499–500 (Tex. App.—Houston [14th Dist.] 2000, no pet.); *see also Taylor v. State*, 592 S.W.2d 614, 615–16 (Tex. Crim. App. 1980). A court's authority to revoke community supervision "is limited by the allegations of which the accused had due notice, i.e., those contained in the written motion to revoke." *Hammack*, 466 S.W.3d at 307; *Moore*, 11 S.W.3d at 499. Notice requirements in the revocation context, however, are not nearly as stringent as those required for an indictment. *Hammack*, 466 S.W.3d at 307; *Pierce v. State*, 113 S.W.3d 431, 436 (Tex. App.—Texarkana 2003, pet. ref'd). "All that is required is that the motion to revoke fully and clearly set forth the bases on which the State seeks revocation so that the accused and his counsel have notice." *Hammack*, 466 S.W.3d at 307 (citing *Leyva v. State*, 552 S.W.2d 158, 162 (Tex. Crim. App. 1977)); *see Labelle v. State*, 720 S.W.2d 101, 104 (Tex. Crim. App. 1986) ("[T]he motion to revoke must give the defendant fair notice of the violation in order to comport with minimum due process requirements.").

A "variance" occurs when there is a discrepancy between the allegations in the charging instrument and the proof at trial; in other words, "the State has proven the defendant guilty of a crime, but has proven its commission in a manner that varies from the allegations in the charging instrument." *Gollihar*, 46 S.W.3d at 246. "However, not every variance between the evidence at trial and the indictment is fatal," *Moore*, 11 S.W.3d at 500 (citing *Stevens v. State*, 891 S.W.2d 649, 650 (Tex. Crim. App. 1995)); only a material variance renders evidence insufficient, *Gollihar*, 46 S.W.3d at 247. A variance is material when it operates to the defendant's

surprise or prejudices his rights. *Id.*; *Hammack*, 466 S.W.3d at 307; *Moore*, 11 S.W.3d at 500. When reviewing a variance, "'we must determine whether the indictment, as written, informed the defendant of the charge against him sufficiently to allow him to prepare an adequate defense at trial, and whether prosecution under the deficiently drafted indictment would subject the defendant to the risk of being prosecuted later for the same crime.'" *Gollihar*, 46 S.W.3d at 257 (quoting *United States v. Sprick*, 233 F.3d 845, 853 (5th Cir. 2000)).

The variance in this case involved a difference between the date in the motions to revoke and the dates proven by the evidence at the revocation hearing. In a trial on an indictment, the State need not allege a specific date; an allegation that conduct occurred "on or about" a certain date allows the State to prove a different date so long as it is anterior to the presentment of the indictment and within the statutory limitation period. *Sledge v. State*, 953 S.W.2d 253, 255–56 (Tex. Crim. App. 1997); *Garner v. State*, 545 S.W.2d 178, 180 n.1 (Tex. Crim. App. 1977). "The burden of proving the date alleged in a motion to revoke is comparable to that for the date in an indictment, except that the requirements for pleadings in a revocation proceeding are less strict than for an indictment." *Chreene v. State*, 691 S.W.2d 748, 750 (Tex. App.—Texarkana 1985, pet. ref'd). When a motion to revoke alleges that a violation occurred "on or about" a particular date, the State "is free to prove the violation occurred any time before the filing of the motion to revoke and during the probation period" while "the defendant was on probation." *Mauney v. State*, 107 S.W.3d 693, 695 (Tex. App.—Austin 2003, no pet.) (citing *Labelle*, 720 S.W.2d at 104); *see Diaz v. State*, 516 S.W.2d 154, 156 (Tex. Crim. App. 1974) ("The 'on or about January, 1974' date allegation clearly shows a time period anterior to the filing of the motion to revoke and within the period of probation."); *Aguilar v. State*, 471 S.W.2d 58, 60 (Tex. Crim. App. 1971) ("Since the State relied upon an 'on or about' allegation in its amended motion to revoke, and evidence showed

11

that offenses were committed and the revocation hearing was held within the period of probation, no fundamental error is reflected.").

It is undisputed that Leshikar was placed on community supervision on August 6, 2018, and was still on community supervision at the time of the revocation hearing. The third amended motions to revoke alleged that he made threatening or harassing Facebook communications against Rydell "on or about the weekend of February 12, 2022." Although the photographs admitted at the hearing are undated, Rydell testified that the communications reflected in them occurred in 2021. Accordingly, because the communications were made prior to the filing of the motions to revoke and while Leshikar was still on probation, we conclude that there was no material variance between the date alleged in the motions to revoke and the evidence at trial. *See Gollihar*, 46 S.W.3d at 247; *Diaz*, 516 S.W.2d at 156; *Aguilar*, 471 S.W.2d at 60; *Mauney*, 107 S.W.3d at 695. The evidence was therefore not insufficient on that basis. *See Gollihar*, 46 S.W.3d at 247.

## II.    Leshikar's violation-of-law issue was not preserved on appeal.

Leshikar next argues that the State failed to prove he committed an offense against the laws of Texas because the motions to revoke did not explicitly state that he committed an offense and did not name or cite a specific statute. Despite his attempt to frame the issue as one of evidentiary sufficiency, his claim is facially and substantively a challenge to the sufficiency of the allegation in the motions to revoke. "[A]ny defects regarding sufficiency of the allegations in a motion to revoke must be raised at trial; failure to object at that time waives the sufficiency of the notice provided by the motion on appeal." *Labelle v. State*, 692 S.W.2d 102, 105 n.2 (Tex. Crim. App. 1985); *see Hunt v. State*, 5 S.W.3d 833, 835 (Tex. App.—Amarillo 1999, pet. ref'd)

12

(stating that "deficiencies in a motion to revoke must be raised at or before trial").  Addressing a similar complaint, the Court of Criminal Appeals has explained:

> Inasmuch as the motion did not allege the commission of an offense, it leaves much to be desired, but we fail to find where the appellant objected and questioned the allegations at any time in the trial court.  He raises the sufficiency of the motion for the first time on appeal.  This he cannot do.

*Martinez v. State*, 493 S.W.2d 954, 955 (Tex. Crim. App. 1973).

Because Leshikar for the first time on appeal challenges the revocation motions' purported failure to adequately allege a violation of law, the issue was not preserved for appellate review, and we will not address it.  *See id.*; Tex. R. App. P. 33.1(a).

## III. The State met its burden of proof.

The alleged violation of condition 1 in the State's motions to revoke closely tracked the statutory language of a subsection of the harassment statute that in relevant part provides that

> [a] person commits an offense if, with intent to harass, annoy, alarm, abuse, torment, or embarrass another, the person . . . publishes on an Internet website, including a social media platform, repeated electronic communications in a manner reasonably likely to cause emotional distress, abuse, or torment to another person, unless the communications are made in connection with a matter of public concern.

Tex. Penal Code § 42.07(a)(8).  The subsection was added relatively recently and has been subjected to few attempts at interpretation.  Thus, in construing its elements, we look for guidance to Texas courts' construction of subsection (a)(7), which is similarly worded.[3]

---

[3] Subsection (a)(7) makes it an offense for a person "with intent to harass, annoy, alarm, abuse, torment, or embarrass another" to send "repeated electronic communications in a manner reasonably likely to harass, annoy, alarm, abuse, torment, embarrass, or offend another."  Tex. Penal Code § 42.07(a)(7).

13

Subsection (a)(8)—the gravamen of which is the publication of repeated electronic communications in a manner reasonably likely to cause emotional distress, abuse, or torment to another person—is a nature-of-conduct offense. *See Ex parte Sanders*, 663 S.W.3d 197, 215 (Tex. Crim. App. 2022) (discussing subsection (a)(7)). "A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." Tex. Penal Code § 6.03(a). The specific intent to inflict harm need not be the offender's sole intent. "Unless the separate intent is specifically an intent *not to harass, annoy, alarm, abuse, torment, or embarrass another*, the existence of a separate, facially legitimate intent to communicate does not negate the prohibited intent." *Ex parte Barton*, 662 S.W.3d 876, 883 (Tex. Crim. App. 2022).

Despite the statute's use of "reasonably likely," it does not incorporate a reasonable person standard for the recipient of the harmful communications. *See Long v. State*, 931 S.W.2d 285, 289–90 (Tex. Crim. App. 1996) (analyzing identical language in subsection (a)(7)). Instead, the words "reasonably likely" at most "plainly import a minimal causality requirement." *Id.* at 289. For example, a person who delusionally believes he has telepathic powers and intends to annoy another through his use of them "would not be covered by the statute because such conduct would not be 'reasonably likely' to annoy the recipient." *Id.* Although the communications must be directed toward and must target the person whom the offender intends to harm, *see Ex parte Nuncio*, 662 S.W.3d 903, 924 (Tex. Crim. App. 2022), one of our sister courts has interpreted subsection (a)(8) not to require any "direct communication between the person engaging in the conduct and the individual he intended to harm," *Schubiner v. Julis*, No. 05-24-00888-CV, 2026 WL 1481432, at *8 (Tex. App.—Dallas May 26, 2026, no pet. h.)

14

(mem. op.). It is enough that the communications are reasonably likely to torment the targeted individual wherever they are published. *See id.*

By "repeated," the statute means only that the total number of communications must be greater than one. *See Wilson v. State*, 448 S.W.3d 418, 424 (Tex. Crim. App. 2014) (concerning meaning of "repeated" in subsection 42.07(a)(4)). The amount, frequency, and "temporal relationship" of the communications "are more appropriately considered evidentiary matters that may be probative of both the defendant's intent and whether the communications are made in a manner prohibited by the statute." *See id.* Although the State may legally obtain a conviction where only two communications were made, it would likely be "exceedingly rare" in those situations that the State could prove the necessary intent. *See id.*

In 2021, Leshikar made at least six Facebook posts that were reasonably likely to torment Rydell, whom they targeted. Leshikar made publicly viewable comments in which he implied that he had sex with Rydell's wife and with one of his three daughters—two of whom were minors at the time—accused him of polygamy, referred to his son as a "boy-slave," and stated that he enjoyed watching his wife have sex with other men. Leshikar also posted several photos depicting Rydell as a demon, one of which—viewed in the light most favorable to the trial court's ruling—depicted crosshairs on his forehead. In other photos, Leshikar manipulated the size of Rydell's children and distorted his genitals. In one particularly escalatory post, Leshikar suggested that he had gone to Rydell's house at night and had looked inside his vehicle. Rydell believed that Leshikar knew where he lived because of Taylor's small size. In their frequency, volume, and tone, Leshikar's posts were strong evidence of his intent to torment Rydell. *See id.*; *see also Moore v. State*, 969 S.W.2d 4, 10 (Tex. Crim. App. 1998) ("Mental states are almost always inferred from acts and words."); *Owens v. State*, 549 S.W.3d 735, 741 (Tex. App.—Austin 2017, pet. ref'd)

15

(declaring that jurors may infer that defendant intends natural consequences of his acts and may infer his knowledge or intent from any facts tending to prove its existence).

The communications not only satisfied the minimal causal requirement imposed by the words "reasonably likely"; they were also highly alarming, offensive, and upsetting to Rydell and his family. *See Long*, 931 S.W.2d at 289. The Taylor police chief instructed him to treat Leshikar's communications as a credible threat. Rydell also learned about Leshikar's history with law enforcement, which caused even greater distress. As a result of the posts, Rydell had police patrol his house, prohibited his children from going out alone, and installed security devices. Such measures—like the evidence of Rydell's mental state—are proof not only that Leshikar's communications were reasonably likely to torment Rydell but that they did.

Officer Wolf's testimony provided additional proof of Leshikar's intent to torment Rydell. Leshikar's actions toward the officer demonstrated that when Leshikar feels wronged by a public servant, he can react in drastic, menacing ways in an attempt to "rule by fear." Following Leshikar's 2016 DWI arrest, he threatened Officer Wolf, surveilled her at work, and followed her parents. The district court could have seen in Leshikar's actions toward Rydell a similar attempt to distress a public employee by lashing out at him and his family.

The dissent would conclude that the State failed to prove by a preponderance of the evidence that Leshikar's Facebook communications did not pertain to a matter of public concern because they related to a public official. *See* Tex. Penal Code § 42.07(a)(8). We do not address that issue for the simple reason that Leshikar did not. Rule of Appellate Procedure 38.1 requires an appellant's brief to clearly and concisely argue for the contentions made, including by making appropriate citations to authorities and to the record. *See* Tex. R. App. P. 38.1(i). Yet although Leshikar challenged—through the two arguments discussed above—the sufficiency of the

16

evidence supporting the trial court's finding that he violated condition 1, he at no point mentioned subsection 42.07(a)(8)'s "matter of public concern" language, cited an authority discussing the language, or referenced the record in a manner relevant to making an argument under that term. Indeed, other than in quotations of the statute and of the State's motions to revoke, the words "public concern" are not used in his brief.

Rule 38.1 "allows an appellant to present whatever issues for review he or she desires, with very few limitations," and as a result, "an appellant is the master of his or her own destiny with respect to what issues the court of appeals is required to address within its written opinion." *Garrett v. State*, 220 S.W.3d 926, 928–29 (Tex. Crim. App. 2007). A court of appeals, conversely, is under no obligation to make an appellant's arguments for him. *Lucio v. State*, 351 S.W.3d 878, 896 (Tex. Crim. App. 2011); *see Busby v. State*, 253 S.W.3d 661, 673 (Tex. Crim. App. 2008) ("This Court has no obligation to construct and compose appellant's issues, facts, and arguments[.]"). This is especially true when it comes to questions of sufficiency. *See Turner v. State*, 4 S.W.3d 74, 80–81 (Tex. App.—Waco 1999, no pet.) (stating that brief asserting sufficiency challenge "is helpful when it focuses our attention on the disputed issues, specifies each element of the crime or cause of action, and specifies which element lacks evidentiary support"), *overruled on other grounds by Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010).

If an appellant elects not to brief a particular argument, we may not reverse his conviction on that basis. *See State v. Bailey*, 201 S.W.3d 739, 743 (Tex. Crim. App. 2006) ("[W]e have established that it is improper for an appellate court to reverse a case on a theory not raised at trial *or on appeal*." (emphasis added)). In other words, because Leshikar "narrowed h[is] arguments on appeal to address only a particular basis for disturbing [the] trial court's ruling,"

namely, the variance and charging-instrument arguments resolved above, it is not for us to "then scour the record in search of other possible bases for reversing the trial court's ruling." *See Wolfe v. State*, 509 S.W.3d 325, 345 (Tex. Crim. App. 2017). Declining to consider issues that Leshikar chose not to argue in this Court is consistent with both "the principle that an appellate court is under no obligation to make an appellant's arguments for her" and "the principle that an appellant is the master of her own destiny on appeal." *See id.*

Viewing the record under the applicable standard of review, we conclude that the district court could have found that the greater weight of the credible evidence created a reasonable belief that Leshikar violated a condition of his probation. *Hacker*, 389 S.W.3d at 864–65; *Rickels*, 202 S.W.3d at 764. Because the trial court could have reasonably found that the State proved the violation of condition 1 by a preponderance of the evidence, the court did not abuse its discretion by revoking Leshikar's community supervision on that basis. *See Hacker*, 389 S.W.3d at 865; *Cardona*, 665 S.W.2d at 493–94. And because the evidence was sufficient to support the district court's finding of true with respect to the alleged violation of condition 1, we need not address whether the evidence was sufficient to support its finding of a violation of condition 26. *See Smith*, 286 S.W.3d at 342; *Cunningham*, 673 S.W.3d at 286. We overrule both of Leshikar's issues.

## CONCLUSION

Having overruled Leshikar's issues, we affirm the district court's judgments revoking community supervision nunc pro tunc.

_____

Rosa Lopez Theofanis, Justice

Before Justices Triana, Theofanis, and Crump
  Dissenting Opinion by Justice Triana

Affirmed

Filed:  July 24, 2026

Do Not Publish

19